UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NELSON B. COLWELL,

    Plaintiff

v.

COMMISSIONER OF SOCIAL
SECURITY,

    Defendant.
_____/

Civil Action No. 10-10091

HON. ARTHUR J. TARNOW
U.S. District Judge
HON. R. STEVEN WHALEN
U.S. Magistrate Judge

## REPORT AND RECOMMENDATION

Plaintiff Nelson Colwell brings this action pursuant to 42 U.S.C. §405(g), challenging a final decision of Defendant Commissioner denying his application for Disability Insurance Benefits and Supplemental Security Income under the Social Security Act. Both parties have filed summary judgment motions which have been referred for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons set forth below, I recommend that Defendant's motion for summary judgment be GRANTED and Plaintiff's motion DENIED.

## PROCEDURAL HISTORY

On April 4, 2006, Plaintiff filed an application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"), alleging disability as of July 26, 2005 (Tr. 97-99, 102-104). After the initial denial of the claim, Plaintiff filed a timely request for an administrative hearing, held on February 3, 2009 in Lansing, Michigan before Administrative Law Judge ("ALJ") Lawrence E. Blatnik (Tr. 25). Plaintiff, represented by attorney Mikel Lupisella, testified, as did Vocational Expert ("VE") Sue Lyons (Tr. 31–48, 48-54). On July 1, 2009, ALJ Blatnik found that Plaintiff was not disabled (Tr. 22). On November 5, 2009, the Appeals Council denied review (Tr. 1-3). Plaintiff filed for judicial review of the final decision on January 11, 2010.

1

**BACKGROUND FACTS**

Plaintiff, born February 7, 1960, was 49 when the ALJ issued his decision (Tr. 97). He completed four years of college and worked previously as a millwright (Tr. 111, 116). He alleges disability as a result of tennis elbow and degenerative disc disease of the neck and lower back (Tr. 110).

### A.  Plaintiff's Testimony

Plaintiff, a resident of Briarwood, Michigan, testified that he stood 5'10" and weighed 230 pounds (Tr. 31). He reported that he was currently receiving Workers' Compensation benefits (Tr. 32). He indicated that he drove four to five times each week, noting that he made the 32-mile trip to the hearing by himself (Tr. 33). Plaintiff reported that aside from college classes, he received training as a millwright and obtained a journeyman's card (Tr. 34).

Plaintiff testified that he stopped working in July, 2005 after he became unable to lift his arms, attributing the condition to pinched neck nerves (Tr. 35). He reported that the condition was caused by a 2001 workplace injury, stating that fusion surgery (performed later in 2001) did not improve his condition (Tr. 35-36). He also noted that he continued to experience back pain as a result of a 1995 back injury (Tr. 36).

Plaintiff reported that he continued to receive monthly treatment for neck, back, and elbow pain (Tr. 36). He alleged continual collarbone, shoulder, and neck pain (Tr. 38). Noting that his most comfortable position was lying on his back on a flat surface, Plaintiff reported that he otherwise attempted to cope with pain by stretching and taking Percocet, Feldene, and Robaxin (Tr. 38-39). He denied medication side effects (Tr. 39).

Plaintiff reported that he was unable to stand in one place for more than 10 minutes or walk for more than 20 before experiencing discomfort (Tr. 39-40). He alleged constant pain while sitting (Tr. 30). He stated that he was unable to lift more than 10 pounds or bend from the waist, stoop, or squat (Tr. 40). He reported that he climbed stairs with difficulty (Tr. 41). He also reported problems grasping objects, particularly with his right hand (Tr. 42). Plaintiff indicated that he smoked half

a pack a day and used alcohol occasionally (Tr. 42). He also reported sleep apnea, noting that a CPAP did not improve his condition (Tr. 43).

Plaintiff testified that he prepared his own meals but left the bulk of the housekeeping chores for his girlfriend (Tr. 44). He denied performing substantive yard work (Tr. 44). Noting that his mother brought him food, he reported that he shopped for only milk or bread (Tr. 44). He alleged that social activities were limited to dining out every two weeks (Tr. 44). He reported using his computer on a monthly basis only (Tr. 45). Plaintiff alleged that as a result of his physical problems, he was unable to hunt, golf, or bowl (Tr. 45). He opined that his inability to sit for extended periods precluded even sedentary work, testifying that he spent the majority of his waking hours in a reclining position (Tr. 45-47).

### B. Medical Evidence

### 1. Treating Sources

In February, 2005, Plaintiff sought treatment for elbow pain (Tr. 132). He was initially treated with biofreeze, ibuprofen, and a tennis elbow strap (Tr. 133). The following month, he reported that his elbow had gotten worse (Tr. 135). The same month, a CT of the neck showed "accelerated degenerative changes resulting in moderate neural foraminal narrowing at the C3-C4 level bilaterally" (Tr. 196). In May, 2005, Mark W. Ealovega, M.D. administered steroid injections (Tr. 203). In July, 2005, Plaintiff sought treatment for neck and shoulder pain (Tr. 188). Sarah Cookinham, M.D. opined that the "heavy lifting" required of a millwright had caused Plaintiff's condition (Tr. 188). Plaintiff was prescribed Flexeril and referred to a specialist (Tr. 188). The following month, Dr. Cookinham administered a steroid injection, resulting in only minimal improvement (Tr. 184-186). Plaintiff was diagnosed with right lateral epicondylitis (Tr. 182). September, 2005 imaging studies of the shoulders and right hand were unremarkable (Tr. 197, 243). Plaintiff was prescribed Feldene (Tr. 180). The following month, an EMG showed "findings consistent with a resolving right C6 radiculopathy without evidence of acute or on going axonal damage" (Tr. 194). Noting that Plaintiff had already been off work since July, 2005, Ann Laidlaw,

M.D. issued an additional two-month work release (Tr. 177). Nonetheless, Dr. Laidlaw characterized the recent EMG findings as "mild abnormalities [that] do not entirely explain the patient's symptoms" (Tr. 176, 216).

In December, 2005, Dr. Laidlaw noted that Plaintiff had not followed up with recommendations for physical therapy (Tr. 173). She renewed his work release for one month (Tr. 173). January, 2006 physical therapy records and Dr. Laidlaw's February, 2006 notes state that Plaintiff's lack of progress was attributable to poor therapy attendance (Tr. 169, 257). Plaintiff explained that housing problems, as a result of his house burning down, were the cause of his spotty record (Tr. 168). The same month, a CT scan of the neck was found to be consistent with studies performed the previous year (Tr. 196, 299).

In March, 2006, Plaintiff requested OxyContin in addition to Percocet for breakthrough pain (Tr. 164, 326). Plaintiff reported hand numbness (Tr. 150). Dr. Ealovega noted that Plaintiff used opiates chronically, stating that he should be "wean[ed] off" (Tr. 147, 236, 293, 323). A June, 2006 CT of the cervical spine showing degenerative changes was otherwise unremarkable (Tr. 289). In July, 2006, Dr. Laidlaw, noting a discrepancy between Plaintiff's account of his physical therapy activity and that of his therapist, observed that Plaintiff had been discharged again from therapy for non-attendance (Tr. 282-283). Plaintiff received a steroid injection in August, 2006 (Tr. 286).

In September, 2006, Dr. Laidlaw discharged Plaintiff from her care, remarking that his lack of improvement was due to his failure to attend physical therapy (Tr. 288). In October, 2006, Dr. Ealovega noted that Plaintiff, now living in his garage while his house was being rebuilt, continued to report severe pain (Tr. 290). Plaintiff, reporting side effects from Oxy Contin, expressed concern regarding long-term opiate use (Tr. 290).

June, 2007 imaging studies of the left foot showed degenerative changes but "no significant bone or joint abnormality" (Tr. 330, 364). The same month, Dr. Ealovega refused to prescribe additional opiates, noting that Plaintiff had recently tested positive for both marijuana and cocaine use (Tr. 315-316). He opined that Plaintiff was capable of work limited to 10-pound lifting and no

4

repetitive hand motions (Tr. 315). Dr. Ealovega reiterated the following month that Plaintiff was capable of working (Tr. 313). In November, 2007, Dr. Ealovega noted that Plaintiff refused to attend drug therapy (Tr. 312). The following month, Plaintiff expressed anger that the cessation of marijuana use was a condition of receiving opiate prescriptions (Tr. 311, 347).

In January, 2008, Plaintiff, again prescribed four Percocet daily, reported "improved pain control" (Tr. 344). In March, 2008, Dr. Ealovega composed a letter on behalf Plaintiff's quest for Workers' Compensation, stating that Plaintiff was "currently totally disabled from working due to his chronic neck pain disorder" (Tr. 308). A July, 2008 MRI of the cervical spine showed "[n]o evidence of spinal cord compression" (Tr. 329). Plaintiff stated that he was "not sure that he would be interested in further cervical spine surgery" (Tr. 339). In August, 2008, an MRI of the lumbar spine showed "a small annular tear" at L5-S1 but was otherwise unremarkable (Tr. 328, 362). The same month, an MRI of the right shoulder revealed "moderate" tendinosis of the rotator cuff but otherwise "mild" conditions (Tr. 302, 327, 361). Plaintiff reported to Dr. Ealovega that he had begun treating with neurologist Galvin Awerbuch, M.D. (Tr. 338).

In November, 2008, Dr. Ealovega recommended that Plaintiff attend a pain clinic (Tr. 334). In February, 2009, Dr. Awerbuch, completing a medical source statement, precluded Plaintiff from lifting more than 10 pounds and walking or standing for than two hours in an eight-hour work period (Tr. 368). He opined that Plaintiff required a sit/stand option, stating further that Plaintiff experienced severe limitations in pushing and pulling (Tr. 368). He found that Plaintiff's physical limitations, dating back to 2001, would create workplace interruptions approximately 25 percent of the time (Tr. 368).

### 2. Non-Treating Sources

SSA case notes from April, 2006 state that Plaintiff experienced trouble sitting, standing, and walking (Tr. 107). Plaintiff was described as "stiff and sore by the end of the interview" (Tr. 107). In July, 2006, Robin Mika, D.O. performed a non-examining Residual Functional Capacity Assessment on behalf of the SSA (Tr. 266). She found that Plaintiff could lift 20 pounds

occasionally and ten pounds frequently; sit, stand, or walk for six hours in an eight-hour workday; and push and pull without limitation in the lower extremities (Tr. 260). Plaintiff's upper extremity abilities were found to be limited by shoulder and neck problems (Tr. 260-261). Manipulative limitations consisted of occasional overhead reaching, and frequent (as opposed to *constant*) handling and feeling (Tr. 262). Dr. Mika found the absence of visual and communicative limitations, but precluded Plaintiff from work involving vibration and prolonged work at unprotected heights (Tr. 265-266).

### C. Vocational Expert Testimony

VE Sue Lyon classified Plaintiff's former work as a millwright as skilled at the "heavy" exertional level[1] (Tr. 50). The ALJ then posed the following question to the VE, taking into account Plaintiff's age, education, and work history:

> [A]ssume we have an individual that could not lift or carry more than 20 pounds occasionally and 10 pounds frequently. Let's assume that during an eight-hour workday, the individual could sit, stand, or walk all for at least six hours, would need a sit/stand option that enabled them to change position every 30 to 40 minutes. Let's assume the individual could not do any climbing of ladders, ropes, or scaffolds; would be restricted to only occasional bending, twisting or turning at the waist, as well as only occasional bending, twisting or turning of the neck ; no overhead reaching with either upper extremity; would be limited to frequent but not constant pushing or pulling with the upper extremities; frequent but not constant handling or fingering with either hand; and no use of air poser, torque, pneumatic, or vibratory tools.

(Tr. 50-51). The VE stated that the above limitations would preclude Plaintiff's former work as a millwright, but would allow the hypothetical individual to perform the unskilled, exertionally light work of a table inspector (3,000 positions in the regional economy), order clerk (2,000), and parts sorter (1,500) (Tr. 51). In the unskilled, sedentary category, the VE found that Plaintiff could work as a surveillance system monitor (650), inspector (1,700), telemarketer (3,000) and order clerk (1,400) (Tr. 51).

---

[1] 20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools; *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy* work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds.

The VE found that if the individual were further restricted to the lifting/carrying of ten pounds occasionally and less than ten pounds frequently and only two hours of walking/standing in an eight-hour period, the individual would be unable to perform any of the above-listed "light" jobs (Tr. 52). She found further that if the individual were additionally restricted to frequent (as opposed to *constant*) handling and feeling with either hand and occasional handling with the dominant hand, the positions of inspector and order clerk would be precluded (Tr. 52).

The VE testified that if Plaintiff's claim that he needed to recline most of the day were credited, he would be unable to perform any work (Tr. 53). She stated that her testimony was consistent with the information found in the *Dictionary of Occupational Titles* ("DOT"), noting that she also relied on her own professional experience and statistical information provided by both state and federal publications (Tr. 53).

### D. The ALJ's Decision

Citing Plaintiff's medical records and testimony, ALJ found that Plaintiff experienced the severe impairments of "degenerative disc disease of the lumbar and cervical spine, status post cervical fusion (2002); right lateral epicondylitis; bilateral shoulder impingement/tendonitis; and mild right carpal tunnel syndrome," but that none of the conditions met or medically equaled the impairments found in Part 404 Appendix 1 Subpart P, Appendix No. 1 (Tr. 16, 18). The ALJ found that Plaintiff retained the Residual Functional Capacity ("RFC") for sedentary work with the following restrictions:

> The claimant can lift or carry ten pounds occasionally and less than ten pounds frequently; stand or walk up to two hours, and sit at least six hours of an eight-hour work shift, with a sit/stand option that allows a change of position every 30-40 minutes. He should never climb ladders, scaffolds, or ropes; only occasionally bend, twist, turn at the waist or the neck; is limited to frequent, but not constant, pushing, pulling or reaching with either upper extremity; no overhead reaching with either upper extremity; frequent, but not constant, handling or fingering with the left hand; and only occasional handling or fingering, with the right (dominant hand). He should never use air, pneumatic, power, torque or vibratory tools

(Tr. 18). Consistent with the VE's final job findings (Tr. 52), the ALJ determined that although Plaintiff was unable to perform his former job, he could work as a surveillance system monitor or telemarketer (Tr. 21).

In support of the non-disability finding, the ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects" of his physical conditions were "not credible to the extent they [were] inconsistent with the residual functional capacity assessment" (Tr. 19). The ALJ found that imaging studies, showing "mild" and "moderate" rather than severe conditions, did not fully support Plaintiff's allegations of disability (Tr. 19). He noted further that Plaintiff was independent in self-care tasks, made meals, drove, and shopped (Tr. 19). Citing medical records showing a positive test for cocaine use, the ALJ also found that Plaintiff's allegations of disability were undermined by the fact that he had engaged in "drug seek[ing] behaviors" (Tr. 19).

## STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence. 42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence is more than a scintilla but less that a preponderance. It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986)(en banc). In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can

be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy. 20 C.F.R. §416.920(a). The Plaintiff has the burden of proof as steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## ANALYSIS

### The Hypothetical Question[2]

Plaintiff argues that the hypothetical limitations posed by the ALJ did not reflect the severity of his impairments. *Plaintiff's Brief* at 6-10, *Docket #11*. He contends that the limitations contained in Dr. Awerbuch's February, 2009 assessment ought to have been included in the hypothetical question. *Id.* Citing *Varley v. Commissioner of Health and Human Services,* 820 F.2d 777, 779 (6th Cir. 1987), Plaintiff contends that the ALJ's failure to account for all of his limitations invalidates the Step Five job findings. *Id.* at 6-7.

*Varley* holds that a hypothetical question constitutes substantial evidence only if it accurately portrays the individual's impairments. *See also Webb v. Commissioner of Social Sec.*

---

[2]Any issue not raised directly by Plaintiff is deemed waived. *United States v. Campbell*, 279 F.3d 392, 401 (6th Cir. 2002). As discussed below, Plaintiff argues that the ALJ erred in failing to adopt Dr. Awerbuck's findings but does not address Dr. Ealovega's March, 2008 opinion letter stating that Plaintiff was disabled (Tr. 308). In any case, Dr. Ealovega's letter, written on behalf of Plaintiff's quest for Workers' Compensation, appears to refer to the issue of whether Plaintiff was capable of returning to his former job rather than whether he was precluded from all work (Tr. 308, 313). Even assuming that the letter could be interpreted to state that Plaintiff was unable to perform *any* work, it contradicts the physician's earlier findings that Plaintiff was capable of a limited range of work (Tr. 313, 315).

368 F.3d 629, 632 (6th Cir. 2004).  However, "the ALJ is not obliged to incorporate unsubstantiated complaints into his hypotheticals."  *Stanley v. Secretary of Health and Human Services,* 39 F.3d 115,118-119 (6th Cir.1994)(*citing Hardaway v. Secretary of Health & Human Servs.,* 823 F.2d 922, 927-28 (6th Cir.1987).

As an initial matter, the ALJ's choice of hypothetical limitations is well supported by the record (Tr. 50-51).  The ALJ adopted Dr. Awerbuch's opinion (limiting Plaintiff to jobs that did not require more than 10 pounds lifting) over a non-examining finding that Plaintiff was capable of lifting 20 pounds on an occasional basis (Tr. 368).  Likewise, the hypothetical limitations included Dr. Awerbuch's finding that Plaintiff required a sit/stand option.  The remaining hypothetical limitations, including a preclusion of the use of air poser, torque, pneumatic, or vibratory tools, is again more limiting than Dr. Mika's findings (Tr.  51-52, 266).

Plaintiff conflates the "hypothetical question" issue with a secondary argument that the ALJ did not give proper deference to Dr. Awerbuch's opinion.  However, the ALJ did not err in rejecting a portion of Dr. Awerbuch's findings.  If for no other reason, Dr. Awerbuch's "disability" opinion (finding the presence of work preclusive conditions from August, 2001 forward) is undermined by the fact that Plaintiff continued to work as a millwright until July, 2005 (Tr. 398).

Procedurally speaking, the omission of Dr. Awerbuch's more extreme findings from the hypothetical limitations was both well discussed and well supported by the record, consistent with the requirements of a treating physician analysis found in 20 C.F.R. § 404.1527(d)(2).  The ALJ discussed the length and nature of the treating relationship, correctly noting that Dr. Awerbuch did not begin treating Plaintiff until a few months before the administrative hearing (Tr. 20).  In fact, the administrative transcript does not contain *any* treating records by Dr. Awerbuch and he is not mentioned until August, 2008.[3]  The ALJ also noted that Dr. Awerbuch's assessment stood at odds with Dr. Ealovega's July, 2007 opinion that Plaintiff was capable of sedentary work (Tr. 20).

---

[3]Dr. Awerbuch is first referenced in Dr. Ealovega's August, 2008 treating notes (Tr. 338). Dr. Ealovega records make clear that Plaintiff was not referred to Dr. Awerbuch by a treating physician, noting that Plaintiff "located" the neurologist on his own (Tr. 338).

As a whole, substantial evidence easily supports the ALJ's non-disability finding. Dr. Laidlaw observed that Plaintiff's claims of disability did not comport with imaging studies showing "mild abnormalities" (Tr. 176, 216). While Plaintiff's February, 2006 failure to complete therapy is attributable to housing problems, treating records show that he was chronically non-compliant with therapy. While Plaintiff professed a continued need for Percoset and Oxy Contin, he was unwilling to attend drug counseling or discontinue regular marijuana use as a condition of opiate use (Tr. 311-312, 347).

In closing, I note that the transcript supports the finding that Plaintiff experienced some degree of limitation. As such, my decision to uphold the ALJ's findings should not be read to trivialize his documented limitations. Nonetheless, the ALJ's determination that the Plaintiff was capable of unskilled sedentary work is well within the "zone of choice" accorded to the fact-finder at the administrative hearing level and should not be disturbed by this Court. *Mullen v. Bowen*, *supra*.

## CONCLUSION

For the reasons stated above, I recommend Defendant's motion for summary judgment be GRANTED and Plaintiff's motion DENIED.

Any objections to this Report and Recommendation must be filed within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

s/R. Steven Whalen  
R. STEVEN WHALEN  
UNITED STATES MAGISTRATE JUDGE

Dated: December 3, 2010

_____

### CERTIFICATE OF SERVICE

I hereby certify on December 3, 2010 that I electronically filed the foregoing paper with the Clerk of the Court sending notification of such filing to all counsel registered electronically. I hereby certify that a copy of this paper was mailed to the following non-registered ECF participants on December 3, 2010: **None.**

s/Michael E. Lang  
Deputy Clerk to  
Magistrate Judge R. Steven Whalen  
(313) 234-5217